IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>vs.<br><br>ONE PARCEL OF REAL PROPERTY WITH BUILDINGS, APPURTENANCES AND IMPROVEMENTS KNOWN AS 38 KNOTTY PINE ROAD, LOCATED IN THE TOWN OF TIVERTON, RHODE ISLAND; ONE 2005 CADILLAC DEVILLE, VIN: 1G6KE57Y55U229750; ONE 2001 CHEVROLET CORVETTE, VIN: 1G1YY32G115122127; ONE LOT OF SIXTY THOUSAND DOLLARS ($60,000) IN U.S. CURRENCY; AND ONE LOT OF THREE THOUSAND FOUR HUNDRED SIXTY DOLLARS ($3,460) IN U.S. CURRENCY,<br><br>Defendants | : | C.A. No. 06-73ML |

**<u>CLAIMANT ALBERT SOUSA'S</u>**
**<u>MOTION TO SUPPRESS ILLEGALLY SEIZED EVIDENCE</u>**

Now comes, Claimant Albert Sousa ("Mr. Sousa") by and through his counsel and moves this Honorable Court pursuant to the Fourth Amendment to the United States Constitution to suppress all evidence obtained by the Tiverton Police Department on August 31, 2005 from his property located at 38 Knotty Pine Road, Tiverton, Rhode Island. No probable cause supported a search of his property in that no evidence supported a nexus between the marijuana seized during a traffic stop and his residential property. Finally, the officers' actions negate the possibility of a good faith exception to the exclusionary rule in this case.

Mr. Sousa requests this court convene a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 155-156 (1978) based on the fact that the magistrate's finding of probable cause to

search Mr. Sousa's property and boats was premised upon material false statements contained within the affidavit which were present due to a reckless disregard for the truth.

Mr. Sousa, through counsel, estimates that a hearing will take two court days.

Respectfully submitted,
**ALBERT SOUSA**
By his Attorney,

/s/ C. Leonard O'Brien
C. LEONARD O'BRIEN (#1886)
MacFadyen, Gescheidt & O'Brien
101 Dyer Street
Providence, RI 02903
(401) 751-5090
(401) 709-5017
Len@ridefense.com

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2006, I electronically filed the within Claimant's **Motion to Suppress Evidence** with the Clerk of the United States District Court for the District of Rhode Island using the CM/ECF System.

The following participant received notice electronically:

Michael P. Iannotti
Assistant U.S. Attorney
U.S. Attorney's Office
Fleet Center
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
Michael.iannotti@usdoj.gov

/s/ C. Leonard O'Brien
C. LEONARD O'BRIEN (#1886)
MacFadyen, Gescheidt & O'Brien

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff<br><br>vs.<br><br>ONE PARCEL OF REAL PROPERTY WITH BUILDINGS, APPURTENANCES AND IMPROVEMENTS KNOWN AS 38 KNOTTY PINE ROAD, LOCATED IN THE TOWN OF TIVERTON, RHODE ISLAND; ONE 2005 CADILLAC DEVILLE, VIN: 1G6KE57Y55U229750; ONE 2001 CHEVROLET CORVETTE, VIN: 1G1YY32G115122127; ONE LOT OF SIXTY THOUSAND DOLLARS ($60,000) IN U.S. CURRENCY; AND ONE LOT OF THREE THOUSAND FOUR HUNDRED SIXTY DOLLARS ($3,460) IN U.S. CURRENCY,<br><br>Defendants | : | C.A. No. 06-73ML |

**CLAIMANT ALBERT SOUSA'S**
**MEMORANDUM IN SUPPORT OF**
**MOTION TO SUPPRESS EVIDENCE**

Now comes Claimant Albert Sousa ("Mr. Sousa") by and through his counsel and moves this Honorable Court pursuant to the Fourth Amendment to the United States Constitution to suppress all evidence obtained by the Tiverton Police Department on August 31, 2005 from his property located at 38 Knotty Pine Road, Tiverton, Rhode Island. No probable cause supported a search of his property in that no evidence supported a nexus between the marijuana seized during a traffic stop and his residential property. Finally, the officers' actions negate the possibility of a good faith exception to the exclusionary rule in this case.

Mr. Sousa has also requested that this court convene a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 155-156 (1978), based on the fact that the magistrate's finding of probable cause to search Mr. Sousa's property and boats was premised upon a material false statement contained within the affidavit which was present due to a reckless disregard for the truth.

The following memorandum presents arguments in support of this motion. This memorandum is submitted pre-hearing in order to outline the issues prior to the requested evidentiary hearings.

**STATEMENT OF THE CASE**

On February 10, 2006, Plaintiff, United States of America, filed a verified complaint pursuant to 28 U.S.C. §§ 1345 and 1355, 1356 and 1395, 21 U.S.C. §§ 881(a)(6) and (7) and 18 U.S.C. § 985 and 19 U.S.C. § 1608, alleging that the above-listed defendant property should be forfeited to the Plaintiff based on a substantial connection between the defendant property and drug activity. The Plaintiff's specific allegations include the narcotics, packaging material and large quantity of cash found at the property.

On March 27, 2006, Claimant Albert Sousa filed a verified statement and claim for seized property asserting his interest in the defendant property. The parties agreed by stipulation entered May 8, 2006 to stay the proceeding until twenty days after the resolution of a parallel criminal matter in Rhode Island Superior Court Indictment N1/2006-0026A.

The events which gave rise to plaintiff's complaint occurred on August 31, 2005 and will be detailed in the Statement of the Facts which follows this section. In summary, on August 31, 2005, Tiverton Police Officer Kenneth Cabral initiated a traffic stop of Mr. Sousa. During the stop Officer Cabral detected an odor he believed to be marijuana and subsequently searched Mr.

Sousa's car and trunk. The search of the trunk resulted in the seizure of 114 lbs. of marijuana. The police then obtained a search warrant from the Honorable Jeanne LaFazia to search Mr. Sousa's house, vehicles and the boats on his property (*Exhibit A*). Among other items, the search resulted in the seizure of drug packaging material, various smaller quantities of marijuana and oxycodone, and $60,000 in cash at Mr. Sousa's house. (*See Exhibit B* for a complete list of seized evidence.)

After the litigation of motions in the Rhode Island District Court, the State of Rhode Island indicted Claimant, Albert Sousa, on a variety of narcotics offenses. On April 26, 2006, in Rhode Island Superior Court, Mr. Sousa pled no contest to one count of possession with intent to deliver a controlled substance, to wit, marijuana, in violation of R.I.G.L.§ 21-28-4.01.2(a)(4)(i). This count related to the marijuana found in the car. All of the charges involving items found in the house at 38 Knotty Pine Road, Tiverton, Rhode Island (defendant's real property) were dismissed.

On May 31, 2006, the Honorable Judge Gale of the Rhode Island Superior Court sentenced Mr. Sousa to the ACI for 10 years, 4 to serve, with 6 years suspended and 6 years probation upon release. Judge Gale's sentence imposed both placement in Minimum Security and Work Release pursuant to R.I.G.L. § 12-19-2.

Parallel State Court Ruling

While this Court is not bound by any decisions from the parallel State Court case, a review of the Honorable District Court Judge Erickson's comments after hearing testimony over seven court sessions is a useful forecast of what issues will arise at a hearing on this motion.[1]

[1] Judge Erickson presided over a Bail Hearing in which Mr. Sousa had also filed a Rule 41 Motion to Suppress. Under Rhode Island state law, prior to considering the evidence, a judge is obliged to consider whether the evidence is admissible at trial when a defendant claims that

Judge Erickson determined that this was an "extremely troubling case." Ultimately, he found that probable cause existed for the stop and search of Mr. Sousa's car that contained 114 lbs. of marijuana and thus, found it unnecessary at the bail hearing to rule formally on the remaining constitutional search and seizure issues that involved the other evidence seized from Mr. Sousa's briefcase and from Mr. Sousa's real property. He believed the facts showed there were "substantial departures from accepted practice and … police department policy." Additionally, Judge Erickson found the affidavit in support of the search warrant was prepared in a "slipshod" fashion and contained a "number of inaccurate statements." He commented that the police exceeded the scope of a permissible inventory search and he observed that the police interrogated Mr. Sousa after he invoked his right to counsel.

## STATEMENT OF FACTS

This is a fact-intensive case involving multiple search and seizure issues. Because the final legal analysis of this motion will be driven by the court's view of the facts and the credibility of both police officer and civilian witnesses, Mr. Sousa requests a full hearing and an opportunity to cross-examine plaintiff's witnesses.

The following statement is meant to be an introduction to the facts that developed in the State Court proceedings. (A 2-volume Appendix of the state court hearing has been filed with this Motion.)

The Traffic Stop

On August 31, 2005 at approximately 11:00 AM, Mr. Sousa was driving his 2001 Cadillac DeVille south on Fish Road in Tiverton, Rhode Island. According to the testimony of

---

evidence is taken in derogation of Fourth Amendment rights and/or rights pursuant to Art. 1, §6 of the R.I. Const. *Fountaine v. Mullen*, 117 R.I. 262, 280 (1976) (evidence inadmissible at trial because constitutionally infirm is also inadmissible at a bail hearing).

Tiverton Police Officer Kenneth Cabral, on the same date and at the same time he was on his way to conduct an investigation in connection with his responsibilities as the Resource Officer at the Tiverton Middle School. Officer Cabral testified that he observed Mr. Sousa driving his car at a speed of 57-59 miles per hour. The legal limit at that location on Fish Road was 35 miles per hour. Officer Cabral initiated a traffic stop of Mr. Sousa, who immediately slowed to a stop. Mr. Sousa provided his driver's license and registration upon request by Officer Cabral. While informing Mr. Sousa of the reason for the stop, Officer Cabral detected a strong odor of marijuana. Officer Cabral then called for back-up police officers so that he could search inside the car.

The Search of the Car

Tiverton Police Officer Daniel Raymond responded to the scene and watched over Mr. Sousa while Officer Cabral conducted a search of the car looking for the source of the odor he believed to be marijuana. Mr. Sousa did not consent to the search of his car. After Officer Cabral completed his search of the front seat area of the car he entered the back seat area and determined the odor of marijuana to be stronger than in the front seat of the car. He pulled down the center armrest of the rear seat and then noticed and opened a latched, plastic divider that adjoined to the trunk of the car. Using a flashlight to illuminate the trunk compartment he saw large black plastic trash bags and smelled an even stronger odor of marijuana. Officer Cabral then used the keys to open the trunk. Inside the trunk he discovered five large black plastic bags containing what was later determined to be approximately 114 lbs. of marijuana.

Subsequent to the discovery of the marijuana, Officer Cabral placed Mr. Sousa under arrest. He handcuffed him, patted him down a second time and placed him in the rear of the

police cruiser. Following that, Officer Raymond took possession of the seized marijuana and delivered it to the police station.

The Briefcase

After Mr. Sousa was placed under arrest and detained in a patrol car, Officer Cabral returned to the Sousa vehicle and retrieved a briefcase, which lay on the front passenger seat. While still in Mr. Sousa's car he searched the briefcase looking for weapons and other items of concern to officer safety. Officer Cabral saw papers and banking bags within the briefcase. No contraband was discovered in the briefcase at this time. Officer Cabral delivered the briefcase and its contents to Detective Sgt. Carr and Detective Michael Miguel at the Tiverton police station.

Detective Miguel opened the briefcase and conducted what he deemed to be an "inventory search" prior to speaking with Mr. Sousa. Within the briefcase Detective Miguel seized five white pills, later determined to be oxycodone, letters addressed to Albert Sousa, a letter from the Tiverton Fire Department addressed to 38 Knotty Pine Road, handwritten pieces of paper with numbers circled on them (which he concluded was a drug ledger), a sketch of a boat showing square portholes and measurements, defendant's business cards, cellular telephones, bank checkbooks and registers, and a personal and confidential letter from Mr. Sousa's attorney. Although he inspected the briefcase soon after the arrest, he did not make a record of what he had seen. The actual written inventory of the briefcase was completed on September 6, almost one week *after* Mr. Sousa was arrested. Notably, the inventory list that was ultimately produced was not an inventory specific to the contents of the briefcase, but included items seized from Mr. Sousa's home as well.

Detective Miguel then showed the material from the briefcase to U.S. Drug Enforcement Agents David Toracinta and Steve Calenda. As part of his investigation of Mr. Sousa, Detective Miguel took the documents he seized from the briefcase to Tiverton Town Hall to obtain information on Mr. Sousa's property.

The Investigation

Detective Miguel of the Tiverton Police Department led the investigation of Mr. Sousa. The first thing he did was to "re-inventory" the briefcase with Sergeant Carr. Using the information found in the briefcase, Detective Miguel and Sgt. Carr interrogated Mr. Sousa, who was advised of and waived his right to remain silent.

The officers questioned Mr. Sousa about his personal residence and involvement with drug activity. Mr. Sousa denied owning property in Tiverton and claimed he was heading to Providence at the time of the stop.

Law enforcement officers from multiple agencies soon became involved in the investigation of Mr. Sousa. Subsequent to the initial interrogation by Det. Miguel and Sgt. Carr, two vice detectives from Fall River also interviewed Mr. Sousa. Later, Agent Steve Calenda from the Drug Enforcement Administration also interrogated Mr. Sousa at the police station. After the Fall River officers left, Det. Miguel and Sgt. Carr re-entered the interrogation room and confronted Mr. Sousa with the paperwork from his briefcase evidencing his ownership of property in Tiverton. At that time, Mr. Sousa refused permission to search his house and requested an attorney.

The Undisputed First Illegal Entry Onto the Property at 38 Knotty Pine Road

The testimony established that the house at 38 Knotty Pine Road was set a couple hundred feet back from the road. Prior to obtaining a search warrant, Detective Miguel and Sgt.

Carr went to Mr. Sousa's house and walked onto and around the private areas of the property. This included attempting to look through windows on the house and garage. They made observations during this first illegal entry that were inserted into the warrant application; (1) they determined that "all of the windows on the residence were either tinted or blacked out," and (2) they learned that in the driveway sat a 2002 26'Chaparral. The Detectives then returned to the Tiverton Police Department and met with DEA Agents Calenda and Toracinta. At this time, after the warrantless entry onto the property, a decision was made to apply for a search warrant.

Officer Cabral was assigned to watch the house while the investigation continued. He remained at the property from 3:00-11:30 PM. He did not see any suspicious activity while surveilling the property. Officer Cabral testified that he observed both Sgt. Carr and Detective Miguel on the grounds of Mr. Sousa's private property before the search warrant was authorized, and although he testified that he "really didn't pay much attention" to whether or not the officers looked into the windows during the first warrantless entry on the property, he testified they did not enter the house at that time. He also testified that no one entered the boat located on the property prior to obtaining the search warrant which was issued at 8:35PM. According to the testimony of Officer Cabral the search warrant was executed sometime after 10:00 PM.

Independent Witnesses to the Search of the House

Neighbors Tina Farias Alfonso and her husband, Jason Alfonso, who lived in the house adjacent to Mr. Sousa's property, responded to a subpoena and testified to their observations on the day of the search. From the Alfonso home, approximately 100 feet from Mr. Sousa's house, they had an unobstructed view of the rear and one side of Mr. Sousa's house.

Ms. Alfonso testified she was a long-time acquaintance of Mr. Sousa. She became concerned for his safety when she arrived home from work around 5:30 PM on August 31, 2005

and saw the police activity at Mr. Sousa's house. The date stood firmly in her memory because it also marked the first day of school for her young son and preceded by one day a newspaper article detailing Mr. Sousa's arrest. She testified under oath that she was absolutely certain she saw a number of police officers *inside* Mr. Sousa's house, *in* his boat, and on his property when she arrived home from work around 5:30 PM.

From her front yard, and during the daylight hours, she saw two police officers remove a cover from Mr. Sousa's boat and enter the boat. Detective Miguel denied removing the cover from the boat during the daylight hours and prior to obtaining the search warrant. However, when asked on cross-examination whether he had been in the boat *before* obtaining the search warrant, he responded, "What do you mean by *in* the boat?" (emphasis added) (Tr. 379). Upon further questioning he denied that he, or to his knowledge anyone else, had been in the boat prior to obtaining the warrant.

From her vantage point, Ms. Alfonso could also see inside Mr. Sousa's windows and observed police officers walking around inside the house. During the police presence on the property, two uniformed police officers and a man who identified himself as "Steve" (and fitting the description of Agent Steve Calenda) questioned her about her knowledge of vehicular traffic at the property. Ms. Alfonso lived close enough to be in a position to observe activity at the property and informed the law enforcement officers that she had not observed any significant amount of vehicular traffic at the property.

Mr. Jason Alfonso, the husband of Ms. Alfonso, also testified. He confirmed the police presence and activity on the property prior to the time the warrant was authorized. Under oath, he testified that he too saw the police searching inside the boat and house during the daylight hours of August 31, 2005.

The Search Warrant Affidavit

According to the police testimony, after returning from the property and discussing the case with Drug Enforcement Agents Toracinta and Calenda, Detective Miguel decided to apply for a search warrant for Mr. Sousa's real property located at 38 Knotty Pine Road, including his boat and vehicles located on the property. He admitted that prior to questioning Mr. Sousa, he had no knowledge of any prior investigation involving Mr. Sousa. He also conceded that, apart from the documents in the briefcase, he had no information that Mr. Sousa owned property in Tiverton.

Detective Miguel testified that he used a search warrant application from another, unrelated investigation as a boilerplate affidavit when he drafted the affidavit in this case (*Exhibit C*). Because he lacked an understanding of some of the language within the unrelated, prior warrant application, he failed to delete information that was completely unrelated to Mr. Sousa's case. He also admitted his final search warrant request contained multiple typographical errors. Because of the errors, the judge was made to believe certain facts existed in Mr. Sousa's case which had no basis in fact. Significantly, Officer Miguel conceded that the following material statements in the affidavit were *unsupported by any facts whatsoever*:

- certain property had been stolen or embezzled or obtained by false pretense, or pretenses, with the intent to cheat or defraud within this state or elsewhere

- informant information and surveillance conducted by your affiant concludes that the target of this investigation utilizes the cover of darkness to conceal his illegal narcotics activity

In addition, Detective Miguel acknowledged that the following assertions within the search warrant affidavit were incorrect and based on his own mistaken view of the facts and evidence:

- while at police headquarters, an inventory search of the vehicle revealed a black briefcase located in the front passenger seat *(the briefcase was searched and seized by Officer Cabral at the scene, not at the police station)*
- [t]he ledgers also indicated the dates of 8/29 and 8/31 indicating a transaction of $20,000 and $26,000 in US currency occurred *(the exact dates were unclear given the many numbers and dates listed in the documents, some of which did not indicate years)*

Invoking Right to Counsel

Mr. Sousa's attorney, Brian Corey, arrived at the police station in response to Mr. Sousa's request for counsel. He advised the officers that his client did not wish to speak further with them. Detective Miguel agrees that he spoke with Attorney Corey and understood that Attorney Corey did not want Mr. Sousa questioned further. However, subsequent to receiving this information, and after Attorney left the station, Det. Miguel *initiated* a new contact with Mr. Sousa to inform him a search warrant had been obtained and to question him regarding the possibility of potential dangers that might exist in the house. During this conversation, Tiverton Police Officer Jones informed Mr. Sousa that officers would "take down the door" during the search. Upon hearing this, Mr. Sousa volunteered information about which keys to use to gain entry and also gave information about drugs located in a closet at the bottom of the stairs in the basement.

## LEGAL AUTHORITY FOR SUPPRESSION

Civil forfeiture proceedings are governed by 18 U.S.C. § 981 *et seq*. In order to prevail in a civil forfeiture action the government must establish by a preponderance of the evidence that there was a substantial connection between the defendant property and the offense—in this case, violations of drug laws. It is well settled that the constitutional exclusionary rule applies to forfeiture proceedings and illegally seized evidence or the fruits thereof cannot be used as

evidence in a civil forfeiture action. *One Plymouth Sedan v. Pennsylvania*, 380 U.S. 693, 696 (1965); *United States v. One Parcel of Real Prop.*, 960 F.2d 200, 206 (1st Cir. 1992).

## SUMMARY OF THE ARGUMENTS

Mr. Sousa asserts that there was no nexus between the marijuana discovered during a traffic stop and the subsequent search of his house. The search was constitutionally impermissible in multiple ways: (1) the warrant contained false and misleading statements which attributed to the magistrate's finding of probable cause; (2) the police illegally entered the curtilage of the house prior to obtaining a warrant which (a) prompted both their decision to seek a warrant and (b) provided them illegally obtained evidence which was a predicate for probable cause to search the house; and (3) the police illegally searched his personal papers within a briefcase which were then exploited to locate his property in Tiverton and also used to support probable cause for the search of the house. With the exception of the marijuana found in the traffic stop, all of the evidence used to support probable cause was obtained from illegal sources or was itself patently false. No probable cause existed to justify the search Mr. Sousa's house. The police conduct throughout the investigation and application for a search warrant cannot be said to amount to good faith and therefore this Court should not apply the good faith exception to the exclusionary rule.

## ARGUMENT

### I. The Search Warrant for 38 Knotty Pine Road Was Invalid

#### A. The Affidavit Contained False Material Statements under *Franks*

There is a presumption of validity with respect to the affidavit supporting the search warrant. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). Where the defendant makes "a substantial preliminary showing that a false statement knowingly and intentionally, or with

reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." *Franks v. Delaware*, 438 U.S. 154, 155-156 (1978).

> "To mandate an evidentiary hearing, the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine. There must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof. … Allegations of negligence or innocent mistake are insufficient. The deliberate falsity or reckless disregard whose impeachment is permitted today is only that of the affiant, not of any nongovernmental informant."

*Franks v. Delaware*, 438 U.S. 154, 171 (1978).

The deference accorded to a magistrate's finding of probable cause does not preclude inquiry into the knowing or reckless falsity of the affidavit on which that determination was based. *United States v. Leon,* 468 U.S. 897 (1984). The First Circuit has recently held:

> "In order for a warrant to be voided and the fruits of the search excluded, the defendant must meet an … exacting standard: he must (1) show that the affiant in fact made a false statement knowingly and intentionally, or with reckless disregard for the truth, (2) make this showing by a preponderance of the evidence, and (3) show in addition that 'with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause.'" *United States v. Tzannos*, 2006 U.S. App. LEXIS 21424 (1st Cir. August 22, 2006), quoting *Franks*, at 156.

Suppression is an appropriate remedy when the officers "were reckless in preparing their affidavit." *Khounsavanh*, *supra* at 288, quoting *United States v. Fuccillo*, 808 F.2d 173, 177 (1st Cir. 1987).

RECKLESS MATERIAL STATEMENT

The material misstatement is as follows:

> "Your complainant prays that said warrant may be served in the day time and or the nighttime for the reason that 24 hour warrant: informant information and surveillance conducted by your affiant concludes that the target of this investigation utilizes the cover of darkness to conceal his illegal narcotics activity."

The officer swore to this statement, and signed immediately beneath it. It was false and made with total reckless disregard of its truth. The Tiverton Police had never heard of Albert Sousa before he was arrested. There was no surveillance over a 24-hour period. The only surveillance was by Officer Cabral who was assigned to watch the house while the investigation unfolded. Moreover, information obtained from interviewing neighbors Tina Farias Alfonso and Jason Alfonso was affirmatively the opposite of this reckless incriminating assertion. They had never seen anything suspicious, never saw Sousa carrying plastic bags, and attested there was infrequent vehicular traffic in Sousa's driveway. It is unquestionable that Judge LaFazia relied on this critical assertion that misrepresented that an informant provided the nexus between Mr. Sousa's house and narcotics activity when no nexus, in fact, existed. She initialed the provision, and authorized the warrant in reliance on this misrepresentation. To explain away or to excuse this reckless assertion as an inadvertent error would be to eviscerate the Fourth Amendment given the totality of the circumstances this case presents.

The Law Applied

In this case, there is ample evidence to require suppression under a *Franks* analysis. The officer conceded the statement highlighted above was false. The officer explained he was unfamiliar with some of the language in the warrant. However, this explanation must be weighed his statements that he sought and received guidance from experienced officers when drafting the affidavit. His failure to educate himself about facts he put before the magistrate

when seeking a warrant to search Mr. Sousa's property establishes his reckless disregard for the truth. This recklessness also evidences a lack of good faith.

When the misstatements are excised, there can be little question that Judge LaFazia would not have issued this warrant. The strongest evidence contained in the four corners of the affidavit came from the implication that surveillance of the house had indicated to the police that drug activity took place at night. Said another way, the police led the magistrate to believe that they had observed drug activity at the property during nighttime hours. This was totally false. There was not a shred of evidence to support that assertion. Suppression is an appropriate remedy.

**B. The Decision to Seek a Warrant was Prompted by Information Obtained During an Illegal Search and the Affidavit Contained Information Obtained During the Illegal Search**

The United States Supreme Court has set forth the proper analysis for the determination of a Fourth Amendment violation when a search pursuant to a warrant is preceded by an illegal entry onto the property. *Murray v. United States,* 487 U.S. 533, 108 S. Ct. 2529, 101 L. Ed. 2d 472 (1988). In *Murray*, police officers conducted an illegal search of a warehouse and then obtained a warrant without using information observed during the illegal search. The Supreme Court held that the "independent source" doctrine permitted the introduction of evidence discovered as a consequence of an unlawful search but later obtained independently from lawful activities untainted by the initial illegality. The First Circuit recently interpreted the holdings of both *Murray* and *Franks* in *United States v. Dessesaure,* 429 F.3d 359 (1st Cir. 2005). The '"ultimate question" is "whether the search pursuant to the warrant was in fact a genuinely independent source of the information and tangible evidence at issue… ."' *Id.* at 365, citing *Murray* at 542. A search may not be considered "independent" if (1) the decision to seek the

warrant was prompted by what they had seen during the initial entry or (2) if information obtained during the illegal entry was presented to the Magistrate and formed a substantive basis of the determination of probable cause. *Dessesaure* at 365-367. The First Circuit court held:

> "[W]hen faced with a warrant containing information obtained pursuant to an illegal search, a reviewing court must excise the offending information and evaluate whether what remains is sufficient to establish probable cause." *Id.*

In determining whether the decision to seek the warrant was prompted by what they had seen during the initial entry the court is "not bound by after-the-fact assurances of their intent, but instead must assess the totality of the attendant circumstances to ascertain whether those assurances appear "implausible." *Dessesaure* at 369 (citations omitted).

The Illegal Entry

It is well settled that the central inquiry in the determination of the "curtilage" of a home depends upon "whether the area in question is so intimately tied to the home itself that it should be placed under the home's 'umbrella' of Fourth Amendment protection." *United States v. Diehl*, 276 F.3d 32, 38 (1st Cir. 2002) (quoting *United States v. Dunn,* 480 U.S. 294, 301 (1987)). The *Dunn* Court spelled out four significant factors for consideration: (1) the proximity of the area claimed to be curtilage to the home, (2) whether the area is included within an enclosure surrounding the home, (3) the nature of the uses to which the area is put, and (4) the steps taken by the resident to protect the area from observation by people passing by. *Id.*

It is undisputed that Mr. Sousa's house was surrounded on the front (or south) side by arborvitae trees. His neighbors testified that a fence bound the house lot on the east side. The fact that defendant's home was located over two hundred feet from Knotty Pine Road, and that the public view was obstructed by trees and a fence, indicates that the property owner had an objectively reasonable expectation of privacy in the premises.

Members of the Tiverton Police Department illegally entered the property prior to obtaining a search warrant and in violation of the Fourth Amendment.

It is also undisputed that, prior to a warrant being authorized, officers walked down a 200-foot private driveway on Mr. Sousa's property and attempted to look through windows and closely inspected the house and vehicles on the property which were not easily visible from any public areas, and obtained information that was later included on the application for a search warrant and affidavit.

What remains disputed is how extensive the search of the property was at this point. Neighbors of Mr. Sousa testified that they witnessed an extensive police presence both inside and outside the house and inside the boat prior to the time the warrant was issued. The officers called to testify in the state court proceedings admit they were on the curtilage but deny that they were inside the house or boat prior to obtaining the search warrant.

There was no exigency that would have permitted entry upon this private property without a warrant. Mr. Sousa was in custody, and an officer was watching the house from a public street to prevent anyone from entering or destroying evidence. There is no suggestion that Mr. Sousa consented to this entry, or that the police were able to obtain this information based on some "plain view" exception, as Detective Miguel conceded that he could not observe the registration numbers or view anything but the south side of the house from a public vantage point. The police entry onto defendant's real estate was unlawful.

None of the exceptions to the warrant requirement existed that would justify Detectives Miguel and Carr entering the property, obtaining registration numbers, and looking in windows that later were utilized in the preparation of a search warrant application. This activity was

conducted with a disregard of Mr. Sousa's constitutional protections. It also evidences the lack of good faith of the officers.

The Law Applied

Both prongs of *Murray* were violated in this case.

1. The First Illegal Entry Prompted the Search Warrant.

The testimony in the parallel state court proceeding was clear that the decision to seek a warrant was not made until after the officers returned from the house and reviewed the case with DEA agents Toracinta and Calenda. While illegally on the curtilage, the officers discovered the following: 1) tinted windows and 2) a boat. They believed these facts connected the house to drug activity because the windows suggested an attempt to conceal activity within and boats were often used for hiding and transporting narcotics. The officers did not begin the warrant application process after the traffic stop disclosed 114 lbs. of marijuana. The officers did not begin the warrant application after their interrogation of him back at the station. Only after their entry on the property and upon further input from Agent Calenda, did the officers make the decision to seek a warrant. When the officers illegally explored the curtilage they knew they had no nexus between the house and the marijuana seized in the traffic stop. Only after seeing tinted windows and the boat did they make the decision to seek the warrant. It is clear that their illegal observations prompted the warrant because there was absolutely no other information which tied the house to drug activity.

2. Information Obtained During the Illegal Entry was Used to Support Probable Cause.

The tinted windows and the boat were each included in the warrant application and, Mr. Sousa avers, contributed to the magistrate's decision to seek a warrant, both of which were suggested as being suspicious and related to drug activity and both of which must be excised

from the warrant application under *Murray* and *Dessesaure*. Once these additional factors are excised, along with the false information about nighttime surveillance, it cannot be said that sufficient facts existed which supported probable cause.

**C. <u>There Was No Probable Cause to Search the House</u>**

The Fourth Amendment to the United States Constitution guarantees that "[t]he right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV.

The First Circuit has held that "[p]robable cause for a warrant based on an affidavit 'exists where information in the affidavit reveals 'a fair probability that contraband or evidence of a crime will be found in a particular place.' 'Probability is the touchstone of this inquiry.'" *United States v. Syphers,* 426 F.3d 461,465 (1st Cir 2005) (quoting *United States v. Baldyga,* 233 F.3d 674, 683 (1st Cir. 2000) in turn, quoting *United States v. Khounsavanh,* 113 F.3d 279, 283 (1st Cir. 1997)).

The term "probable cause" cannot be defined precisely, but it clearly "mean[s] more than bare suspicion*: ...*" *Brinegar v. United States,* 338 U.S. 160, 175 (1949). Such cause exists when "the facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed." *Brinegar, supra* at 175.

Where the police seek entry to a dwelling, "[t]he critical element in a reasonable search is not that the owner of the property is suspected of crime but that there is reasonable cause to believe that the specific 'things' to be searched for and seized are located on the property to

which entry is sought." *Zurcher v. Stanford Daily,* 436 U.S. 547, 556 (1978). In such circumstances, "[a] search warrant … is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place, and therefore safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police." *Steagald v. United States,* 451 U.S. 204, 213 (1981). Thus, even if there is probable cause to arrest a person for a crime, that fact does not automatically give the police probable cause to search his/her residence or other area in which s/he has been observed for evidence of that crime. *United States v. Charest,* 602 F.2d 1015 (1st Cir. 1979); *see also, United States v. Badessa,* 752 F.2d 771, 774 (1st Cir. 1985). Instead, the police must establish a clear nexus between the objects to be seized and the place to be searched. *United States v. Charest, supra* at 1017. The "nexus 'can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime].'" *United States v. Ribeiro,* 397 F.3d 43, 49 (1st Cir. 2005) quoting *United States v. Charest, supra* at 1017. A court must consider the "nature of the information, the nature and characteristics of the supposed criminal activity, the nature and characteristics of the place to be searched …." *United States v. Schaefer*, 87 F.3d 562, 568 (1st Cir. 1996).

In addition to a clear nexus with the place to be searched, a showing of probable cause requires "the proof must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time." *Sgro v. United States,* 287 U.S. 206, 210 (1932). Stated another way, in considering the issue of probable cause for the issuance of a search warrant, the question is whether the supporting affidavit contains sufficient facts to permit

a reasonable conclusion that the object of the search was actually on the premises to be searched at the time the warrant issued.

The search warrant affidavit should establish that "there is a fair probability that contraband or evidence of a crime will be found in a particular place. *Illinois v. Gates,* 462 U.S. 213, 238 (1983). When facts averred in an affidavit arise from an informant "an important indicia of reliability is the fact that the informant's knowledge [is] based on personal information rather than hearsay." *United States v. Cochrane,* 896 F.2d 635, 641 (1st Cir. 1990) (finding probable cause existed to support a search warrant based in part on information from an informant claiming that he had purchased drugs from the defendant's home, even though the affidavit did not state the particular date the transaction took place).

The Law Applied

In this case, it is undisputed that the police did not have a shred of direct evidence that Albert Sousa's home was being used to store narcotics, or any other contraband. Despite surveillance during the investigation and an inquiry of neighbors, no drug trafficking or unusual activity was noted or observed. There was no predictive information received from anyone, incriminating or innocuous, that the police were able to corroborate. *See, Illinois v. Gates,* 462 U.S. 213 (1983). Even the State, in the parallel proceedings, conceded that "no record or testimony indicates that the Tiverton Police had any idea that [Mr. Sousa] had any passing association with Tiverton [prior to the traffic stop on Fish Road]." *Memorandum of Law in Support of State's Objection to Defendant's Motion to Suppress*, p.5.

The warrant application contains no demonstration of probable cause to believe that marijuana, money, drug ledgers or the like would be found at Mr. Sousa's Tiverton property. The cause represented to the issuing magistrate is nothing more than rank speculation and

impermissible inference stacked upon inference. The fact that Mr. Sousa's car was stopped with marijuana in the trunk 1.3 miles from his house, and the fact that he denied owning property in Tiverton is not probable cause to believe that marijuana would be found in his house. Similar arguments are advanced with respect to the boat and truck.

Detective Miguel's suggestion that boats are used for smuggling, and that defendant had a boat, invited the judge to speculate impermissibly that this boat was used in smuggling. This suggestion is, again, rank speculation, especially since a large number of Tiverton residents who are not drug dealers, own boats given Tiverton's location along the Sakonnet River with outlets to Narragansett Bay and Rhode Island Sound. No articulable facts were advanced that would support any probable cause to search the boat or the truck, any more than the house.

The affidavit did not establish a fair probability that marijuana would be found at 38 Knotty Pine Road. There was no ongoing investigation of Mr. Sousa, and no meaningful surveillance of his home. There was no confidential informant who claimed to have seen contraband in his home, or any current, reliable information that suggested that marijuana would be found on the premises. There was no controlled buy. The assertion that a confidential informant from the New Bedford area told Detective Paul that Mr. Sousa was a "drug dealer" at some undisclosed time provided no information relative to his home in Tiverton, and moreover, undercuts the notion that Mr. Sousa's Tiverton property was involved in any criminal activity. There was no representation of how this informant knew of Mr. Sousa, or whether his information was based on personal knowledge, a private grudge or simply rumor. Not only was the information stale because there was no specification of when it was provided but it was also unreliable because it did not disclose whether the informant had any <u>personal knowledge</u> that

drug activity had occurred at 38 Knotty Pine Road. *United States v. Schaefer*, supra, at 568 (affidavit supporting a search warrant must contain timely information or else it will fail).

A review of this affidavit reveals that it contains much superfluous information that, when examined, had no connection to drug activity. For instance, the inclusion of checking account and bank information without any explanation or assertion whatsoever that they were connected to drug activity was misleading and not supportive of probable cause. Also, the inclusion of the boat description and sketches without any assertion as to how they might be connected to drug activity in this case was again misleading and not supportive of probable cause. Moreover, it evidences a lack of good faith of the officers. (See, *infra*, Section III, good faith discussion)

Detective Miguel merely asserted he knew of "narcotics hides" in boats. He was unable to offer any evidence that a sketch of a boat contained within the briefcase with other neutral, non-incriminating evidence, in addition to incriminating evidence (assuming for argument's sake there were drug ledgers in the briefcase), had any connection to drug activity.

When examining the totality of the circumstances, there was no substantial basis for concluding that probable cause to search defendant's property and seize his bank accounts existed. *Illinois v. Gates, supra* at 238-39. Insufficient "facts" and unreasonable inferences were advanced by Detective Miguel to obtain the search warrant. No probable cause existed. The search and seizures were unlawful, and the evidence must be suppressed.

## II. <u>The Search of the Briefcase was Illegal</u>

### A. <u>The Search Exceeded the Scope of a Permissible Inventory Search</u>

"An inventory search is the search of property lawfully seized and detained, in order to ensure that it is harmless, to secure valuable items (such as might be kept in a towed car), and to

protect against false claims of loss or damage." *Whren v. United States*, 517 U.S. 806, 812 (1996) citing *South Dakota v. Opperman*, 428 U.S. 364 (1976). Because an inventory search is an exception to the warrant requirement, the burden is on the government to demonstrate that the inventory search was permissible. An inventory search of a vehicle is only reasonable if it is conducted pursuant to standardized regulations and police procedures. *Illinois v. Lafayette*, 460 U.S. 640 (1983); *Colorado v. Bertine*, 379 U.S. 367 (1987); *United States v. Lage*, 183 F.3d 374, 380 (5th Cir. 1999). An inventory search must not be a ruse for general rummaging in order to discover incriminating evidence, but rather an administrative procedure designed to produce an inventory. *United States v. Haro-Salcedo*, 107 F.3d 769, 772-73 (10th Cir. 1997).

The Supreme Court prohibits the use of an inventory search for investigative purposes when probable cause does not support the search and seizure of the item. *Whren, supra* at 806. When vehicles are impounded, local police departments are required to follow a routine procedure of securing and inventorying an automobile's contents, designed for protection of the owner's property, the protection of the police against claims of lost or stolen property, and the protection of the police from potential danger. *South Dakota v. Opperman,* 428 U.S. 364 (1976). The Supreme Court has consistently maintained its view that standardized criteria must regulate the opening of containers found during inventory searches.

> "The policy or practice governing inventory searches should be designed to produce an inventory. The individual police offer must not be allowed so much latitude that inventory searches are turned into a purposeful and general means of discovering evidence of crime." *Florida v. Wells,* 495 U.S. 1, 4 (1990).

<u>The Law Applied</u>

In this case, the inventory search of the briefcase was an impermissible extension of the limited exception to the warrant requirement, and cannot be justified as an inventory search.

The state court record indicates that after Officer Cabral searched Mr. Sousa's trunk, he seized the briefcase, went through the briefcase, noting the existence of papers, a banker's bag with some money in it, and the absence of any weapons. He did not find any contraband in the briefcase. Subsequently he brought the briefcase to the police station, and gave it to Detective Miguel, who conducted a second search of the briefcase and discovered drugs inside.

Tiverton Policy E.4 (*Exhibit D*), pertaining to inventory searches of vehicles, provides that an inventory search should not be undertaken merely as a pretext to facilitate a criminal investigation, and expresses a preference for getting a warrant. This policy provides that an inventory search under such circumstances must be limited in scope to protecting the interests of the property owner, the public and the police against false accusations. Nonetheless, Detective Miguel admitted that he used these documents to interrogate Mr. Sousa, and exploited them by continuing his investigation of the property at the Tiverton Town Hall.

Another Tiverton Police Policy, H.1 (*Exhibit E*) also provides that "when an inventory search is performed, an inventory sheet shall be filled out by the inventory officer, if possible in the presence of the tow truck driver or other appropriate witness, who shall be identified on the inventory sheet, and a copy of the inventory shall be provided to the tow truck driver or the owner or custodian of the vehicle. The original copy of the inventory sheet shall be turned in with the case report. Where any items inventoried are to be seized and held as evidence or contraband, they will be identified separately on the form, and the departmental procedures for identifying, packaging, and storage of such evidence shall be followed."

During his testimony, Det. Miguel conceded he did not follow the department policy regarding inventory searches. Detective Miguel also failed to follow department inventory policy by failing to create a log of the items in the briefcase when he took possession of them

prior to interrogating Mr. Sousa. It wasn't until September 6, 2005, six days later, that the items from the briefcase were logged.

Det. Miguel searched a briefcase that had already been searched by Officer Cabral, and delved into its contents and read personal documents which were not connected to any drug activity. This was not done to protect the police from false claims and safeguard Mr. Sousa's property. He never prepared an actual inventory of the contents of the briefcase, only a listing of *all* evidence seized from divers locations. He admitted that he used these documents to interrogate Mr. Sousa and to continue his investigation at the Tiverton Town Hall. He acted in violation of the established policy, conducted a general rummaging through an arrestee's briefcase which contained personal papers and legal documents looking for evidence. His actions cannot stand in the face of United States Supreme Court precedents on permissible limits of inventory searches.

Police officers do not have free rein and should not be permitted to examine in great detail items that might reveal very "intimate areas" of a person's life. *Opperman, supra*. at 380, n. 7 (Powell, J.) (concurring). Justice Powell specifically listed letters and checkbooks as two examples of items that "touch on intimate areas of an individual's personal affairs." He concluded, however, that the police in *Opperman* merely removed "miscellaneous papers," a checkbook, an installment loan book, and a social security card *without examining their contents*, and concurred with the majority that the search in that case was authorized. *Id.* (emphasis added). *See,* 3 Wayne R. LaFave, *Search and Seizure,* § 7.4(a), Commentary, wherein Professor LaFave concluded:

> "In *Opperman*, the police, when they looked in the glove compartment, also found 'miscellaneous papers' (a checkbook, an installment loan book, and a social security status card), which, so far as the record indicates, they removed without examination. *Opperman* thus should not be read as authorizing

examination of such documents. Rather, the case quite conclusively indicates that a majority of the Court would not approve of such a practice as part of the routine vehicle inventory search."

Detective Miguel scrutinized personal documents, exploited their evidentiary leads, and used this information to apply for both a search warrant for Mr. Sousa's Tiverton property and a seizure warrant for his checking account. His detailed inspection of these documents went far beyond what was necessary to protect the police from false claims and safeguard Mr. Sousa's property, and was a pretext for an impermissible search for evidence. Evidence obtained from the briefcase could not be used to further a criminal investigation or to obtain a search warrant for his Tiverton real estate, his boat, vehicles, and bank accounts, and must be suppressed as fruit of the poisonous tree.

**B. <u>The Search of the Personal Papers Within the Briefcase Was Not Supported by Probable Cause</u>**

After the initial search by Officer Cabral (at the scene of the traffic stop) failed to produce any contraband, there was no reason and no probable cause to search the personal papers within the briefcase. *Id*., *Opperman*. *See also*, *United States v. Infante-Ruiz,* 13 F.3d 498 (1st Cir. 1994) (search of a briefcase located within a trunk after the arrest of the defendant-passenger was not supported by probable cause nor did it qualify, based on the facts of that case, under any other exception to the warrant requirement of the Fourth Amendment).

The officers found personal paperwork with Mr. Sousa's address which they exploited to locate his residence which was previously unknown to them. They also used the information in the briefcase to support probable cause by implying that personal bank papers were involved with the seized marijuana deals when in fact they were simply personal banking papers with no connection whatsoever to narcotics dealing. The officers also found paperwork inside the briefcase which contained dates that they concluded amounted to evidence of drug deals. From

all these illegally seized papers they attempted to supply a nexus between the car and the house when no nexus existed.

## III. <u>No "Good Faith" Exists to Justify an Exception to the Exclusionary Rule</u>

In *United States v. Leon,* 468 U.S. 897, 922 (1984) the United States Supreme Court established a "good-faith" exception to the exclusionary rule. It reasoned that the exclusion of illegally seized evidence acted as a deterrent to future violations of the Fourth Amendment. *Id.* Therefore, if an objectively reasonable law enforcement officer relied in good faith on a defective warrant then suppression would serve no deterrent purpose. *Id. Leon* made clear however, that the good faith defense is unavailable whenever the warrant affidavit is either "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," or knowingly false or recklessly proffered under *Franks v. Delaware, supra*. *Leon* at 923, quoting *Brown v. Illinois,* 422 U.S. 590, 610-611 (1975).

The First Circuit has held that the remedy of exclusion is inappropriate when the warrant affidavit does not reflect "deliberate misstatement[s] nor any other bad faith." *United States v. Diehl*, 276 F.3d 32, 44 (1st Cir. 2002), *cert. denied, Diehl v. United States,* 2002 U.S. LEXIS 6182 (Oct 7, 2002) (affiant officer's inconsistency about the precise location he stood when he smelled marijuana, either protected curtilage or public road, <u>with no other evidence that material information had been omitted or supplied</u> did not evidence bad faith).

<u>The Law Applied</u>

There can be no finding of good faith if the court finds that officers began their full-scale search prior to the Magistrate's authorizing the warrant at 8:35 PM. Mrs. Tina Farias Alfonso and Mr. Jason Alfonso, Mr. Sousa's neighbors to the north, both testified at the hearing. There was no evidence presented that impeached their credibility and, further, they were civilian

witnesses who had no way of knowing that their observations of a day time search were significant because they had no idea what time the warrant issued in this case. They each testified that they had unobstructed views of Mr. Sousa's house and boat. They both saw plainclothes and uniformed police officers *inside* the first and second floor of defendant's premises, in his boat, and searching the yard and other vehicle around 5:30 PM, during the daylight hours. Both testified that the boat was searched multiple times before and after sunset. Ms. Faria Alfonso testified that she and her husband were interviewed by someone named Steve, a white male with longish dark hair and facial hair, who claimed he was a representative of the DEA, in the presence of two uniformed police officers. They were questioned about what they had observed as far as vehicular traffic to the Sousa premises, and whether they saw him walking around with large garbage bags. Both witnesses testified that they told police they had seen nothing unusual, and that officers with whom they spoke would not tell them what was going on. Both testified that they were acquainted with Mr. Sousa, but had never been in his home or socialized with him. They had no interest in this case or motive to lie, and their presence was compelled by subpoena. The circumstances of their inadvertent discovery – when counsel Lise J. Gescheidt was photographing Mr. Sousa's property, and Ms. Farias Alfonso sought to determine Ms. Gescheidt's purpose for being present on the Sousa property – only underscores their credibility. The testimony of the Alfonsos, who were in a position to view what was happening during daylight hours on the Sousa property, casts serious doubt of the good faith and truthfulness of Detective Miguel.

Also, in preparing the affidavit, the officer swore to a statement (discussed *supra* in section I A) that there had been: 1) surveillance at night by him, 2) informant information related to the house, and 3) information that Mr. Sousa concealed his narcotics activity by conducting

activity at night. The officer used these facts to support the need for a nighttime search warrant. The officer signed his name immediately beneath this false statement. It was made with a total reckless disregard for the truth. The officer explained this false statement was a result of his unfamiliarity with some of the language in the warrant. His explanation is insufficient. Surely the officer understood the words "informant" and "surveillance" and the phrase "the target of this investigation utilizes the cover of darkness to conceal his illegal narcotics activity." If the officer was truly ignorant as to the meaning of those words, then his failure to educate himself prior to submitting the affidavit to the magistrate establishes his reckless disregard for the truth and he cannot be said to be acting in good faith. Not knowing the meaning of material statements in the affidavit is bad faith in and of itself.

Bad faith is also apparent with regard to the officer's implication that the sketch of the boat found within the briefcase was connected to the boat on Mr. Sousa's property. The affiant explained that he had "training and experience dealing with narcotics hides and has observed narcotics hides located inside boats." This bare assertion was reckless and not made in good faith when there was no information connecting the sketch to the boat on the property.

Further, Detective Miguel chose not to inform Judge LaFazia that Sousa's neighbors had been interviewed, and had never observed any unusual or suspicious activity, vehicular or pedestrian traffic. In fact, Detective Miguel knew the neighbors had affirmatively denied any evidence of unusual traffic and omitted this fact. This omission was made in bad faith.

Additionally, the police obtained statements from Mr. Sousa after he invoked his right to counsel. The police admitted they initiated contact with Mr. Sousa after his attorney, Brian Corey, departed the police station. The police statements and questions elicited incriminating statements regarding his knowledge of drugs in a basement closet. The statements were obtained

in violation of defendant's Sixth Amendment right to counsel. The government cannot demonstrate any waiver of his right to counsel at this juncture and the police actions demonstrate the lack of good faith of the officers in this case.

The affidavit also contained false information implying that stolen or embezzled property might be located at Mr. Sousa's property. This was totally false and cannot be excused. It again evidences the lack of good faith of the officers in this case. This reckless inclusion of false and unrelated information was compounded by the officer's bare assertion that he seized two bankbooks from the briefcase. The implication that the finances from these accounts were proceeds of drug dealing was reckless and made in bad faith. One checking account had just been opened with two deposits, a week apart, totaling $2,500.00, while the other checkbook was his household account, and showed checks to credit card companies, his dentist, tax payments, and other personal expenses that were not "in large, round numbers." This account contained a modest amount of money for household expenses. Detective Miguel testified, before the court twice ordered him twice to bring this evidence to court, that he believed they were proceeds of drug trafficking because they contained big, round numbers. This was misleading, and false, and raises significant questions regarding the credibility and good faith of the affiant.

Finally, Judge Erickson determined that this was an "extremely troubling case." He believed the facts showed there were "substantial departures from accepted practice and … police department policy." Additionally, Judge Erickson found the affidavit in support of the search warrant was prepared in a "slipshod" fashion and contained a "number of inaccurate statements." He commented that the police exceeded the scope of a permissible inventory search and he found that the police interrogated Mr. Sousa after he invoked his right to counsel. All of

Judge Erickson's observations will surface at the evidentiary hearing on this motion before this court and will contribute to Mr. Sousa's argument that in this case, the officers lacked good faith.

**Conclusion**

For all of these reasons and for those which my arise on further litigation of this motion, Mr. Sousa requests that this Honorable Court suppress and exclude the evidence illegally seized from his residence in this case.

Respectfully submitted,
**ALBERT SOUSA**
By his Attorney,

/s/ C. Leonard O'Brien

C. LEONARD O'BRIEN (#1886)
MacFadyen, Gescheidt & O'Brien
101 Dyer Street
Providence, RI 02903
(401) 751-5090
(401) 709-5017

## CERTIFICATE OF SERVICE

I hereby certify that on December 11, 2006, I electronically filed the **Claimant's Memorandum in Support of the Motion to Suppress** with the Clerk of the United States District Court for the District of Rhode Island using the CM/ECF System.

The following participant received notice electronically:

Michael P. Iannotti
Assistant U.S. Attorney
U.S. Attorney's Office
Fleet Center
50 Kennedy Plaza, 8th Floor
Providence, RI 02903
Michael.iannotti@usdoj.gov

In addition, a copy of the two-volume Appendix was filed conventionally with the Court Clerk on December 11, 2006. The U.S. Attorney, Michael P. Iannotti, has previously been served with a copy of the Appendix

/s/ C. Leonard O'Brien
C. LEONARD O'BRIEN (#1886)
MacFadyen, Gescheidt & O'Brien